UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| THOMAS MCCRACKEN, *et al.*, | Case No. 2:16-cv-01920-RFB-GWF |
| Plaintiffs, | ORDER |
| v. | |
| REGIONAL TRANSPORTATION COMMISSION OF SOUTHERN NEVADA, *et al.*, | |
| Defendants. | |

## I. INTRODUCTION

Before the Court is Defendants Regional Transportation Commission of Southern Nevada ("RTC"), M.J. Maynard, and Carl Scarbrough's Motion to Dismiss the Amended Complaint. ECF No. 33. Plaintiffs Thomas McCracken and CE Mobile Installs, LTD opposed the Motion, and Defendants replied. ECF Nos. 37, 38.

## II. PROCEDURAL BACKGROUND

Plaintiffs sued Defendants on August 12, 2016. EFC No. 1. Defendants moved to dismiss the original complaint on September 30, 2016. ECF No. 8. The Court entertained oral arguments on the motion on May 9, 2017. ECF No. 20. At the hearing, the Court granted the motion in part, dismissing Plaintiffs' claim brought under Monell v. New York City Department of Social Services, 436 U.S. 658, 690 (1978) with prejudice and Plaintiffs' claims for First Amendment retaliation without prejudice. Id. The Court also dismissed the state law claims for lack of jurisdiction. Id.

///

Plaintiffs moved for leave to file an amended complaint on May 23, 2017, which the Court granted as to the First Amendment retaliation claims and the state-law claims. ECF Nos. 19, 31. The Court emphasized that the Monell claim would not proceed. ECF No. 31. Plaintiffs' Amended Complaint was filed on March 30, 2018, alleging the following claims: (1) Monell violation against RTC; (2) First Amendment retaliation against RTC, Scarbrough, and Maynard in their official capacities; (3) First Amendment retaliation against Scarbrough and Maynard in their individual capacities; (4) breach of contract against all Defendants; (5) breach of covenant of good faith and fair dealing against all Defendants; and (6) tortious interference with prospective economic relations against all Defendants. ECF No. 32.

Defendants now move to dismiss the Amended Complaint. ECF No. 33. Plaintiffs opposed the Motion, and Defendants replied. ECF Nos. 37, 38. The Court held a hearing on the Motion on November 15, 2018. ECF No. 44.

### III. FACTUAL BACKGROUND

The Amended Complaint alleges the following:

Plaintiff McCracken is an independent contractor, and Plaintiff CE Mobile is a Nevada corporation. Plaintiffs began contracting with Defendant RTC, a political subdivision of the State of Nevada, in July 2004. Under the contract, Plaintiffs provided installation and maintenance services for security cameras and computer-aided dispatch equipment on RTC buses. McCracken also served as an authorized dealer for Safety Vision, a company that sold equipment to RTC. In his role as an authorized Safety Vision dealer, McCracken presented his own purchase orders and installation packages directly to RTC via invoices when selling Safety Vision parts. He also worked on RTC sites to provide Safety Vision installation services.

In April of each year, the RTC Board of Commissioners ("Board") approved the budget for equipment and services publicly submitted by Plaintiffs. The funds were then awarded, set aside, and earmarked for Plaintiffs to be paid once detailed invoices were received by RTC. Plaintiffs subsequently provided RTC with invoices of purchase orders or of work, products, installation, maintenance, warranties, and other customary and appropriate details for each

transaction. This course of dealing continued for twelve years, during which time Plaintiffs completed all projects without issue and RTC paid all invoices without issue. Plaintiffs worked directly with John Nevill, the prior RTC Manager of General Equipment, over the twelve years.

Then, on February 16, 2016, Nevill notified Plaintiffs that he was placed on administrative leave and that Plaintiffs would now coordinate with Defendant Scarbrough. RTC began to pay Plaintiffs' invoices late once Scarbrough took control.

McCracken met with Scarbrough multiple times in February and March 2016 to discuss past-due invoices. McCracken knew how much money was preapproved for each work order since the budget was passed at the start of the fiscal year. McCracken therefore questioned why the earmarked funds were not available to pay the outstanding invoices. Scarbrough never provided an answer; he instead demanded that Plaintiffs provide new information for each unpaid invoice, stating the preapproved invoices were incomplete. RTC had never deemed Plaintiffs' invoices to be incomplete during the parties' prior twelve-year relationship. But Plaintiffs acquiesced and made the requested changes. Scarbrough then falsely informed Plaintiffs that the invoices were scheduled to be paid the next time RTC issued vendor payments.

After not receiving payment, McCracken grew concerned that the preapproved funds were no longer available to pay the outstanding invoices and that Defendants did not plan on remitting payment. McCracken believed that Scarbrough was demanding additional information to avoid paying Plaintiffs altogether or to build a case to terminate Plaintiffs' contract.

McCracken considered pursuing the outstanding invoices via collection services. He emailed his concerns to an RTC employee that was "higher up [than Scarbrough on] the chain of command." He also discussed the outstanding invoices and his concerns regarding the possibility of nonpayment with other contractors, vendors, and people associated with RTC. He learned that other vendors were experiencing issues with receiving timely payments from Scarbrough.

McCracken specifically discussed his concerns with Safety Vision employees in February and May 2016, shortly after Safety Vision had recently signed a multi-million-dollar contract with RTC. Safety Vision revealed that it had warned Scarbrough that RTC's credit terms were approaching the limit, thereby risking RTC's credit rating. RTC paid Safety Vision thereafter.

Despite paying other vendors, RTC continued to refuse to pay Plaintiffs' invoices. McCracken thus reached out to Nevill, who had been reassigned to a different RTC position. McCracken shared his concern about nonpayment and his fear that the earmarked money may no longer be available. He also shared his plan to pursue the outstanding invoices via collection services.

Nevill then revealed that RTC's credit rating was recently raised. "This was critical, as RTC was trying to raise bond money for the approved light-rail plan and an unfavorable credit report would risk the bond money for the pre-approved plans." ECF No. 32 at 5. Nevill offered to escalate McCracken's complaints to Tina Quigley, the RTC General Manager. In her position, Quigley reported directly to the Board. McCracken agreed to refrain from seeking collecting services based on the twelve-year relationship between Plaintiffs and RTC so that Nevill could bring the issue to Quigley's attention.

By this time, McCracken "began to believe it was highly probable that RTC was withholding payments to vendors in order to artificially inflate its credit rating" and that RTC was attempting to avoid paying Plaintiffs entirely to bolster its credit ratings to obtain better bond returns. Id. at 6. McCracken therefore emailed Defendant M.J. Maynard, the RTC Deputy General Manager and Scarbrough's supervisor. He requested an in-person meeting.

McCracken met with Maynard on March 28, 2016. Maynard informed McCracken that Scarbrough's department had been poorly managed by Nevill. McCracken expressed his concerns regarding the nonpayment and the availability, or lack thereof, of the earmarked funds. Despite the work being preapproved previously, Maynard demanded that McCracken further amend the outstanding purchase orders and unpaid invoices to provide additional information. Maynard also told McCracken that she would advise on what information was still needed. As of the date of the Amended Complaint, she has failed to do so.

In approximately April 2016, Scarbrough and Maynard met with a Safety Vision agent. They stated that they were dissatisfied with Plaintiffs since McCracken approached their superiors about the management of department funds. Either Scarbrough or Maynard expressed that they, "Don't see [Plaintiffs] in the future." When asked if their decision to terminate Plaintiffs' contract

was in response to Plaintiff pressing for payment of the outstanding invoices and for answers from superior RTC officials about the availability of funds, neither Scarbrough nor Maynard denied it.

On April 13, 2016, Safety Vision informed McCracken that Scarbrough was extremely angry at McCracken for speaking to his superiors about the unpaid invoices and allegations of unavailable funds.

Then, on May 2, 2016, Defendants terminated Plaintiffs' contract and services with RTC.

## IV. LEGAL STANDARD

In order to state a claim upon which relief can be granted, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In ruling on a motion to dismiss for failure to state a claim, "[a]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." Faulkner v. ADT Security Servs., Inc., 706 F.3d 1017, 1019 (9th Cir. 2013). To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning that the court can reasonably infer "that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).

## V. DISCUSSION

Plaintiffs assert federal claims against Defendants under 42 U.S.C. § 1983: (1) a Monell claim and (2) two First Amendment retaliation claims. Section 1983 does not create substantive rights but merely is a device for enforcing certain Constitutional provisions or federal statutes. See Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 617 (1979). The elements of a Section 1983 claim are: (1) violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a "person" (4) acting "under color of state law." Crumpton v. Gates, 947 F.2d 1418, 1420 (9th Cir. 1991).

The Court dismisses Plaintiffs' Monell claim in accordance with its prior orders, which previously dismissed the claim with prejudice. The Court therefore turns to Plaintiffs' First

Amendment retaliation claims, first addressing the sufficiency of the allegations and then considering the issue of qualified immunity.

**a. First Amendment Retaliation Allegations**

To begin, "'[c]itizens do not surrender their First Amendment rights by accepting public employment.'" Barone v. City of Springfield, Oregon, 902 F.3d 1091, 1101 (9th Cir. 2018) (quoting Lane v. Franks, 134 S. Ct. 2369, 2374 (2014)). "Indeed, the public has an interest in receiving the well-informed views of government employees engaging in civic discussion, because government employees are in the best position to know what ails the agencies for which they work." Id. (internal quotations omitted).

"The First Amendment's guarantee of freedom of speech protects government employees from termination because of their speech on matters of public concern." Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. V. Umbehr, 518 U.S. 668, 675 (1996). The protections afforded to government employees extend to independent contractors; the First Amendment prohibits the termination of at-will government contracts in retaliation for the exercise of freedom of speech. Id. at 675–80. The Ninth Circuit applies a sequential five-step inquiry, derived from Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty. Illinois, 391 U.S. 563, 568 (1968), to determine if a plaintiff has alleged a First Amendment retaliation claim against a government employer:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

Clairmont v. Sound Mental Health, 632 F.3d 1091, 1102–03 (9th Cir. 2011). The burden lies with the Plaintiff on the first three steps but shifts to the government in the last two steps. Id. at 1103.

Here, the parties dispute whether the matter qualifies as public concern. "Whether a public employee or contractor's expressive conduct addresses a matter of public concern is a question of law." Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 924 (9th Cir. 2004). "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest[.]"

Lane, 134 S. Ct. at 2380 (internal quotation marks and citation omitted). "[S]peech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of performance of governmental agencies is generally not of public concern." Turner v. City & Cty. of San Francisco, 788 F.3d 1206, 1211 (9th Cir. 2015) (internal quotations omitted).

"Whether speech addresses a matter of public concern 'turns on the content, form, and context of the speech.'" Moonin v. Tice, 868 F.3d 853, 863 (9th Cir. 2017) (quoting Lane, 134 S. Ct. at 2380). "[C]ontent is the greatest single factor in the … inquiry." Alpha Energy Savers, Inc., 381 F.3d at 925. But "an employee's motivation is relevant to the public-concern inquiry." Turner, 788 F.3d at 1206; see also Desrochers v. City of San Bernardino, 572 F.3d 703, 715 (9th Cir. 2009) (internal quotations omitted).

The Ninth Circuit has "framed that inquiry with two questions: Why did the employee speak (as best as [the court] can tell)? Does the speech seek to bring to light actual or potential wrongdoing or breach of public trust, or is it animated instead by 'dissatisfaction' with one's employment situation?" Turner, 788 F.3d at 1210. Thus, while speech "ostensibly could invoke a matter of public concern," it is not protected if it "[arises] primarily out of concerns for [the plaintiff's] own professional advancement [or internal grievances]." Id. Further, "[i]n a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern." Desrochers, 572 F.3d at 710 (internal citations omitted).

The Court finds that Plaintiffs fail to allege that the at-issue speech is protected under the First Amendment because the allegations, taken in the light most favorable to Plaintiffs, do not establish that the speech constitutes a matter of public concern. The content of the at-issue speech focuses on Plaintiffs' desire to be paid for their services provided under the contract. While Plaintiff mused and pondered whether RTC's credit rating or misallocation of funds might have contributed to the failure to pay the invoices, his speech was focused on procuring payment. Thus, Plaintiffs' speculation as to the reasons for RTC's delayed payment is of no consequence, as Plaintiffs' actual speech arose primarily out of Plaintiffs' concerns over the unpaid invoices owed

to them. That is McCracken spoke in order for Plaintiffs to be paid.

Further, the Court notes that Plaintiffs did not raise or threaten to raise in a public form any allegation of RTC's purported misallocation of funds. While Plaintiffs discussed with other vendors the issue of nonpayment, these conversations were focused on nonpayment and not alleged financial misconduct by RTC. Because the at-issue speech was made to further Plaintiffs' purely private interest of obtaining payment on past due invoices rather than for bringing to light actual or potential wrongdoings, the Court finds the speech is not protected under the First Amendment. The Court dismisses the First Amendment retaliation claims accordingly.

### b. Qualified Immunity

Even if Plaintiffs adequately alleged that McCracken's speech constitutes a matter of public concern, the Court finds that Defendants are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Qualified immunity is an immunity from suit rather than a defense to liability, and "ensures that officers are on notice their conduct is unlawful before being subjected to suit." Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014).

In deciding whether public officials are entitled to qualified immunity, courts consider, taking the facts in the light most favorable to the nonmoving party, whether (1) the facts show that the officer's conduct violated a constitutional right, and (2) if so, whether that right was clearly established at the time. Id. Under the second prong, courts "consider whether a reasonable [government official] would have had fair notice that the action was unlawful." Id. at 1125 (internal quotation marks omitted). While a case directly on point is not required for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2083 (2011). This ensures that the law has given officials "fair warning that their conduct is unconstitutional." Ellins v. City of Sierra Madre, 710 F.3d 1049, 1064 (9th Cir. 2013). Further, the right must be defined at "the appropriate level of generality[;] [the court] must not allow an overly generalized or excessively specific

construction of the right to guide [its] analysis." Cunningham v. Gates, 229 F.3d 1271, 1288 (9th Cir. 2000); see also al-Kidd, 131 S.Ct. at 2084. The plaintiff bears the burden of proving that the right was clearly established. Id. at 1125.

The Court finds that Scarbrough and Maynard are entitled to qualified immunity because Plaintiffs have not made out a constitutional violation of a clearly established right. While the law clearly establishes a right for independent contractors contracting with the government to be free from retaliation after taking part in protected speech, Umbehr, 518 U.S. at 675–80, the protected speech must regard a matter of public concern and be made in the contractor's capacity as a private citizen, Clairmont, 632 F.3d 1102–03.

McCracken initially complained solely about the untimely payments of Plaintiffs' invoices and only later hypothesized to other vendors that the earmarked funds were no longer available in light of the continual nonpayment. His speech therefore focused on his private interest of being paid and was made in his capacity as a quasi-public employment rather than his capacity as a private citizen. Moreover, there is no allegation that RTC officials were aware or made aware of any alleged conversations between the Plaintiffs and other vendors. Because of the nature of McCracken's communications with the RTC regarding nonpayment of invoices, a reasonable government official would not have fair notice that the speech later transformed into matters considered public concern based on McCracken's own speculation that earmarked funds may not be available. This is especially so given that three of Plaintiffs' own allegations contradict McCracken's hypothesis: (1) RTC officials required additional information to detail the work for which Plaintiffs' were invoicing; (2) detailed invoices were always required but later enforced after Scarbrough replaced Nevill; and (3) other RTC vendors were paid after complaining of untimely payments.

Plaintiffs point to two cases to oppose the award of qualified immunity: O'Brien v. Welty, 818 F.3d 920, 936 (9th Cir. 2016) and Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 926 (9th Cir. 2004). O'Brien, however, does not address the requirement that a government employee's speech cover an issue of public concern; the case instead applied First Amendment protections to a private citizen who spoke critically of a university rather than a government

employer. Thus, O'Brien is inapplicable. Likewise, Alpha Energy Savers acknowledges that "speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of government agencies, is generally not of public concern." 381 F.3d at 924 (internal quotations omitted). Alpha Energy Savers then focused on the content of the at-issue speech. Id. The content of McCracken's speech regarded Plaintiffs' unpaid invoices and then later evolved to include his speculation that the invoices were not being paid due to the unavailability of previously earmarked funds. But as explained *infra*, Plaintiffs allegations demonstrate the content was merely speculation as to why Plaintiffs' personal grievances were not remedied. The Court therefore finds that Scarbrough and Maynard are entitled to qualified immunity.

## VI. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants Motion to Dismiss is **GRANTED**. The Court dismisses Plaintiffs' Monell claim and First Amendment claims and instructs the Clerk of the Court to enter judgment in favor of Defendants accordingly.

**IT IS FURTHER ORDERED** that the Court declines to exercise supplemental jurisdiction over the remaining state-law claims under 28 U.S.C. § 1367(c)(3) and dismisses them without prejudice. Thus, the Court of the Clerk is instructed to close this matter accordingly.

DATED: February 19, 2019.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**